UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

TOWER PROPERTIES LLC, d/b/a NICOLES
a/k/a NICOLES CATERING HALL,

                                    Plaintiff,

        -against-

VILLAGE OF HIGHLAND FALLS and
PATRICK FLYNN, individually and as Mayor of
the Village of Highland Falls,

                                    Defendants.

14-cv-04502 (NSR)

OPINION & ORDER

NELSON S. ROMÁN, United States District Judge

        Plaintiff Tower Properties LLC ("Plaintiff") brings this action pursuant to 42 U.S.C. §§

1982 and 1983 against Defendants Village of Highland Falls (the "Village") and Mayor Patrick

Flynn (the "Mayor"), individually and in his official capacity, asserting violations of its First and

Fourteenth Amendment rights, as well as its rights to make and enforce contracts, and to

purchase, lease, sell, hold and convey real and personal property.  Before the Court are

Defendants' motions to dismiss the Second Amended Complaint ("SAC") and to disqualify

Plaintiff's counsel.  For the following reasons, Defendants' motion to dismiss is GRANTED in

part and DENIED in part.  Defendants' motion to disqualify counsel is DENIED.

## BACKGROUND

        The following facts are taken from the SAC unless otherwise noted, and are accepted as

true for the purposes of this motion.

        Plaintiff, a limited liability company ("LLC") organized under the laws of the State of

New York, operated Nicoles catering hall ("Nicoles") located in Highland Falls, New York.  At

the time Plaintiff filed its SAC, Plaintiff had been operating in Highland Falls for approximately



16 months.  Prior to Plaintiff operating Nicoles, another unrelated entity operated a catering hall at the same location for more than ten years.  Nicoles' clientele and its employees were predominately African-American and other minorities, and most of its events – weddings, birthdays, and other private parties – catered to African-Americans.

Plaintiff alleges that the Village and the Mayor "intentionally embarked on a continuous policy and practice . . . to harass and shut down Nicoles because of the race of those who c[a]me to Nicoles."  (SAC ¶ 1.)  Plaintiff's specific allegations are set forth in greater detail below.  As of December 31, 2014, Nicoles dismissed all of its employees and is no longer doing business.  (*See* January 12, 2015 Letter of Jeff Feigelson, Docket No. 22.)

1.   Statements By Public Officials

The SAC contains a number of statements made by the Mayor that purportedly evidence the existence of a continuous policy or practice to discriminate against Nicoles because of the race of its customers.  For instance, during a meeting of the Village's board ("Village Board") on March 17, 2014, the Mayor remarked that he was "concerned about the functions that are happening at Nicoles … they're attracting a large group from Spring Valley and Newburgh." (SAC ¶ 11.)  According to Plaintiff, this statement was merely code for "African-Americans," as those communities are largely populated by African-Americans.  Further, the Mayor also met with a member of Nicoles' management, at which time he stated that Nicoles was attracting the "wrong crowd" and that he did not want "these types of people infecting Highland Falls."  (SAC ¶ 13.)  Similarly, Plaintiff alleges that these statements were also code for "African-Americans."

Plaintiff also alleges that Konstantinos Fatsis, the prosecutor for the Village, referred to Nicoles' African-American customers as "hood rats" in a Facebook post, reflecting the racial bias of some of the leaders of the Village.  (SAC ¶ 15.)

2.   The Village's "Live Entertainment" Statute

Chapter 126 of the Village Code requires any person providing live entertainment to

obtain a permit (the "Live Entertainment Statute" and "Live Entertainment Permit,"

respectively).   According to Plaintiff, the Village has never issued a violation notice for failure to

comply with the statute, despite the fact that many of the bars, restaurants, and catering halls in

the Village, including the prior catering hall at Nicoles' location, do not have the required permit.

Nevertheless, in early January 2014, rather than notifying Plaintiff of the need for a permit, the

Mayor ordered the police to issue a violation notice to Nicoles.   At 11:50 p.m. on January 11,

2014, the Village police issued the violation notice to Nicoles without any warning and ordered

the catering hall to shut down for the evening.   At that time, the penalty for violating the Live

Entertainment Statue was a maximum fine of $250 and/or a term of imprisonment not longer

than 15 days.

Other establishments in the Village, which Plaintiff terms the "White Establishments,"

purportedly have live entertainment at their facilities from time to time and cater predominately

to a white clientele.   At the time Nicoles received its violation notice, Plaintiff contends that none

of the White Establishments had the required permit, but nevertheless did not receive a violation

notice.   Further, the Mayor, who runs a private party company providing deejays for events, has

never obtained a permit to provide live entertainment despite performing at four events held in

the Village between 2011 and 2014.   The Mayor's deejay company has never received a notice

for violating the Live Entertainment Statute.

On or about January 13, 2014, Plaintiff filed an application for a permit to provide live

entertainment at Nicoles.   According to Plaintiff, upon receipt of a permit application, the

Village's Chief of Police shall initiate an investigation to determine if "the applicant is a person

3

of good moral character," and if he finds such, shall approve the application.  (SAC ¶ 35.)

Plaintiff contends that neither the Village nor the Mayor have the power to refuse to issue the

permit if the Chief of Police finds the applicant is of good moral character.  (SAC ¶ 37.)  On or

about January 15, 2014, the Chief of Police concluded that Plaintiff was of good moral character

and was entitled to receive the permit.  Nevertheless, the Mayor requested that the Chief of

Police not approve the permit "until I tell you to," (SAC ¶ 41), and Defendants refused to issue

the permit until after the Village Board voted on the application during its next meeting,

scheduled for January 22, 2014.  Plaintiff further alleges that no applicant ever: (1) required a

vote of the Village Board to approve its permit; (2) waited more than three days for approval of

its permit; and (3) had the Mayor instruct the Chief of Police to delay approval of its permit.

Plaintiff finally received its permit on January 24, 2014, following a Village Board vote at the

January 22, 2014 meeting.  The permit was, however, only valid for a period of six months,

despite the Live Entertainment Statute requiring the issuance of a permit valid for one year.

Plaintiff alleges that one or more of the White Establishments received permits for one year.  As

a result of the Mayor's decision to delay granting the permit, Plaintiff was forced to cancel two

events planned for the weekend of January 17 and 18, 2014, resulting in lost profits and incurring

ill will with its customers.

    The Live Entertainment Statute was amended on or about March 17, 2014, increasing the

monetary penalty for a violation from $250 to $1,000.  Plaintiff alleges that the Mayor's purpose

behind proposing the amendment was to put Nicoles out of business.  During the Village Board

meeting at which the amendment was proposed, the Mayor purportedly stated that he was

"concerned about the functions that are happening at Nicoles … they're attracting a large group

from Spring Valley and Newburgh... this is why this [amendment of the Live Entertainment

4

Statute] has happened." (SAC ¶ 56) (alterations in original). At the same meeting, the Mayor also stated that he hoped to "fine [Nicoles] or put them in jail" if they held events. (SAC ¶ 57.)

3.   The 2 a.m. Curfew

The Live Entertainment Statute prohibits the playing of live music after 2 a.m. in the Village. Plaintiff was notified orally and in writing by the Defendants that if Plaintiff played music after 2 a.m., its Live Entertainment Permit would be revoked. Plaintiff alleges that Nicoles is the only establishment against which the curfew is being enforced and that the White Establishments often play music past 2 a.m.

4.   Police Presence at Nicoles

Plaintiff alleges that as a result of instructions from the Mayor, the Village's police department opened a number of baseless investigations into Nicoles. For example, the Mayor filed one or more police reports related to Nicoles for "suspicious activity." (SAC ¶ 68.) When the police investigated, no suspicious activity was found. Plaintiff confronted the Mayor, who initially denied filing a report, but later admitted to doing so. Similarly, the Mayor instructed the police to investigate whether Nicoles was involved in illegal activity related to organized gangs in the surrounding areas. The police investigation found no evidence of illegal activity or any relationship to gangs. Finally, the Mayor conducted his own personal investigation of Nicoles – he was seen peering into Nicoles' windows outside of regular business hours and was known to keep close tabs on the business, including reviewing Nicoles' Facebook page for objectionable material. For instance, the Mayor notified Nicoles of certain purportedly objectionable pictures posted on its Facebook page, which consisted primarily of "young African American men smiling while holding up a champagne bottle or other bottle of liquor . . . ." (SAC ¶ 82.) Prior to

these investigations, Plaintiff asserts that there were never any police complaints or incidents involving Nicoles.

In addition, Plaintiff alleges that the Village police department had an unnecessarily large presence around Nicoles during many of its events.  For instance, police cars would park in Nicoles' parking lot for up to an hour with their lights on.  During Nicoles' New Year's Eve event, the Mayor purportedly ordered half of the Village's police cars to park outside Nicoles for the entire evening.  According to Plaintiff, the increased police presence deterred customers from coming to Nicoles and caused Plaintiff to suffer financial damages.

Finally, Plaintiff alleges that there was only one police incident at Nicoles prior to filing the SAC – an altercation outside of the catering hall in which no weapons were involved and no arrests were made.  Nevertheless, as a result of the altercation, the Defendants sent Plaintiff a letter warning that its Live Entertainment Permit could be in jeopardy if any future incidents occurred.  The Mayor purportedly notified the New York State Liquor Authority about the altercation.

Plaintiff contends that there is significantly less police scrutiny of the White Establishments.  Despite many more altercations at those establishments, the Defendants never issued a warning letter to or contacted the New York State Liquor Authority about the White Establishments.

**STANDARD ON A MOTION TO DISMISS**

To survive a motion to dismiss, a complaint must supply "factual allegations sufficient 'to raise a right to relief above the speculative level.'"  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  In other words, the complaint must allege "'enough facts to state a claim to relief that is plausible

6

on its face.'" *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In applying this standard, a court should accept as true all well-pleaded factual allegations, but should not credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Id.*

## DISCUSSION

Defendants move to dismiss the SAC on a number of grounds, which the Court addresses *seriatim* below.

## I.     Standing

Plaintiff alleges that Defendants have deprived it of: (1) "its right to make and enforce contracts," in violation of 42 U.S.C. § 1981 (SAC ¶ 131); and (2) "its right to 'purchase, lease, sell, hold and convey real and personal property,'" in violation of 42 U.S.C. § 1982. (SAC ¶ 134.) Defendants urge this Court to find that Plaintiff either lacks standing to assert these claims of racial discrimination on behalf of its alleged minority clientele, or, as an LLC, Plaintiff is barred from bringing an action under § 1982, which is reserved only for citizens of the United States.

First, relying solely on *Hotel St. George Associates v. Morgenstern*, 819 F.Supp. 310 (S.D.N.Y. 1993), Defendants argue that Plaintiff, a catering hall, has not been discriminated against on the basis of race, but instead seeks to assert claims on behalf of its alleged minority clientele, which is not permitted under §§ 1981 and 1982. In *Hotel St. George*, "a hotel association brought an action under §§ 1981 and 1982, on behalf of [its] black and latino HIV and AIDS infected tenants against individual members of community organizations for civil rights violations arising from the organizations' efforts to limit the number of black and latino

HIV and AIDS infected individuals who reside[d] on the premises." *Puglisi v. Underhill Park Taxpayer Ass'n*, 947 F.Supp. 673, 684 (S.D.N.Y. 1996).  There, this Court found that "as a matter of law, plaintiff has not been a victim of discrimination within the terms of 42 U.S.C. §§ 1981 and 1982. . . . For example, plaintiff in its complaint attempted to assert the rights of Black and Latino residents and potential residents.  This is not permitted under Sections 1981 and 1982." *Hotel St. George*, 819 F.Supp. at 318.  Importantly, as other courts analyzing *Hotel St. George* have noted, "there is no indication that the hotel was alleging injury on its own behalf but was clearly trying to bring the claim *on behalf of* its black and latino HIV and AIDS infected tenants, the direct victims of the alleged discriminatory actions." *Puglisi*, 947 F.Supp. at 684 (emphasis in original).

Defendants' reliance on *Hotel St. George* is misplaced.  As Plaintiff points out, courts have distinguished *Hotel St. George* in cases where, as here, the Plaintiff "is suing as *the* injured party, discriminated against directly because of [its] contractual relationship with [its] minorit[y] clientele." *Pisello v. Town of Brookhaven*, 933 F.Supp. 202, 216 (E.D.N.Y. 1996) (emphasis in original); *see also Puglisi*, 947 F.Supp. at 684-85 ("Here, in plaintiff's complaint he alleges that he, himself, as a landlord, is a direct victim of defendant's actions in that he personally has been intimidated, attacked, and threatened and is, therefore, best suited to bring the claim."). Accepting Plaintiff's pleadings as true for purposes of this motion, and drawing all reasonable inferences therefrom, Plaintiff sufficiently alleges that it, rather than its clientele, was discriminated against as a result of serving its predominately African-American, minority clientele, and therefore has standing to bring this action under §§ 1981 and 1982.

Second, Defendants contend that 42 U.S.C. § 1982 establishes rights that are available only to "citizens of the United States," and Plaintiff, as an LLC, is not a citizen within the

meaning of § 1982 and therefore lacks standing to bring this claim.  Defendants' argument relies, again, on a single case, *Comtel Technologies, Inc. v. Paul H. Schwendener, Inc.*, No. 04 Cv. 3879, 2005 WL 433327 (N.D. Ill. Feb. 22, 2005), in which the Northern District of Illinois held that § 1982 limits its protection to "'citizens,' a category that does not include . . . private corporations." *Id.* at *6.  Nevertheless, Defendants fail to acknowledge that the United States Court of Appeals for the Seventh Circuit – the circuit in which the Northern District of Illinois sits – noted in 2007 that corporations are citizens under § 1982.  *See New West, L.P. v. City of Joliet*, 491 F.3d 717, 720 (7th Cir. 2007).  In *New West*, the Seventh Circuit reviewed a Northern District of Illinois decision that found, without citation to any authority, that New West, as a corporation, was not a citizen for § 1982 purposes.  The Seventh Circuit then recognized the limited nature of the authority on the subject, likely due to the fact that "the Supreme Court held 163 years ago that a corporation *is* a citizen . . . ." *Id.* at 720 (citing *Louisville, Cincinnati & Charleston R.R. v. Letson,* 43 U.S. 497 (1844), *overruling Bank of the United States v. Deveaux,* 9 U.S. 61 (1809)).  The court concluded that though "[t]here are scattered exceptions–for example, a corporation is not a 'citizen' for the purpose of the privileges and immunities clause . . . no court has held that corporations cannot be citizens under § 1982." *Id.*

Notwithstanding that Defendants' cited authority is seriously called into question by the Seventh Circuit's decision in *New West*, Plaintiff is an LLC, not a corporation.  Though this Court is not aware of any cases that have determined whether LLCs are citizens under § 1982, and neither party cites to any such authority, LLCs are treated like partnerships for purposes of diversity jurisdiction under 28 U.S.C. § 1332, taking the citizenship of each of its members.  *See*, *e.g.*, *Bayerische Landesbank, New York Branch v. Aladdin Capital Mgmt. LLC*, 692 F.3d 42, 49 (2d Cir. 2012) (internal citation omitted); *see also Cosgrove v. Bartolotta*, 150 F.3d 729, 731 (7th

Cir. 1998) ("Given the resemblance between an LLC and a limited partnership, and what seems to have crystallized as a principle that members of associations are citizens for diversity purposes unless Congress provides otherwise (as it has with respect to corporations, in 28 U.S.C. § 1332(c)(1)), we conclude that the citizenship of an LLC for purposes of . . . diversity jurisdiction is the citizenship of its members."). Applying the diversity jurisdictional rule to § 1982, the Seventh Circuit in *New West* considered the citizenship of the partners of the limited partnership plaintiff, finding that they were all "citizens" and therefore had rights protected under § 1982. *New West*, 491 F.3d at 720. Here, Plaintiff alleges that all of its members are citizens of the United States. (SAC ¶ 133.) Following the Seventh Circuit's reasoning, and in light of this Circuit's application of the same rule for jurisdictional purposes, *see Bayerische Landesbank*, 692 F.3d at 49, Plaintiff, through its members, has rights protected by § 1982.[1]

## II.    Section 1983 Claims

Plaintiff asserts four theories of liability under § 1983: Defendants' violated its constitutional rights of freedom of association, equal protection, and due process, as well as its statutory rights under § 1981. To prevail on any claim under § 1983, a plaintiff must show "(1) the deprivation of a right secured by the Constitution or laws of the United States, and (2) that the alleged deprivation was committed under color of state law." *Landon v. Cnty. of Orange*,

---

[1] Defendants also state in a footnote in their memorandum of law in support of the instant motion that Plaintiff does not have standing because it is not the "real party in interest" as required by Fed. R. Civ. P. 17(a). (Def.'s Mot. to Dismiss at 5 n.2.) Defendants' argument is based upon a conclusory statement, without citation to any authority, that Plaintiff is not the owner of the property located at 11 Main Street. Despite Defendants' contention, Plaintiff alleges that it "owns a catering hall business located at 11 Main Street in the Village of Highland Falls." (SAC ¶ 5.) In light of Plaintiff's allegation, and in the absence of any well-supported statements to the contrary, the Court cannot grant Defendants' motion on this basis. Nevertheless, even if Plaintiff was not the real party in interest, dismissal would not be appropriate at this stage. *See* Fed. R. Civ. P. 17(a)(3) ("The court may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to . . . be substituted into the action."). And, in any event, substitution of plaintiffs under Rule 17(a)(3) is "liberally allowed when the change is merely formal and in no way alters the original complaint's factual allegations as to the events or the participants." *Advanced Magnetics, Inc. v. Bayfront Partners, Inc.,* 106 F.3d 11, 20 (2d Cir. 1997).

No. 08 Cv. 8048 (CS) (LMS), 2009 WL 2191335, at *4 (S.D.N.Y. July 23, 2009); *see also Chambliss v. Rosini*, 808 F. Supp. 2d 658, 666 (S.D.N.Y. 2011).  "Because the United States Constitution regulates only the Government, not private parties, a litigant claiming that his constitutional rights have been violated must first establish that the challenged conduct constitutes state action." *Fabrikant v. French*, 691 F.3d 193, 206 (2d Cir. 2012) (quoting *Flagg v. Yonkers Sav. & Loan Ass'n*, 396 F.3d 178, 186 (2d Cir. 2005)).  Individual defendants can be liable for § 1983 violations only if they were "personally involved" in the alleged constitutional deprivations.  *See Wright v. Smith,* 21 F.3d 496, 501 (2d Cir. 1994); *Rekowicz ex rel. Congemi v. Sachem Cent. Sch. Dist.,* No. 11 Cv. 1561 (JS) (ETB), 2012 WL 4172732, at *4 (E.D.N.Y. July 2, 2012).

The Court addresses each of Plaintiff's theories of liability under § 1983, and Defendants' arguments for dismissal, in turn.

    A.    *Freedom of Association*

Plaintiff's first theory of liability under § 1983 arises from Defendants' alleged violations of "the freedom of association clause of the First and Fourteenth amendments."  (SAC ¶ 128.)  In sum, Plaintiff alleges that Defendants' interfered with its minority clientele's right to associate at its catering hall.  In its memorandum of law in opposition to the instant motion, Plaintiff also argues that because it holds weddings at its catering hall, Defendants' harassment of and attempt to shut down Plaintiff infringes on its clientele's "right to freely express their religion at their marriage celebrations."  (Pl.'s Mot. in Opp. at 20.)

 In *Roberts v. U.S. Jaycees*, 468 U.S. 609, 617-18 (1984), the Supreme Court recognized two types of associational freedoms – "freedom of intimate association" and "freedom of expressive association."  The former protects one's right "to enter into and maintain certain intimate human relationships . . . as a fundamental element of personal liberty," *id.* at 618, while

11

the latter protects the "right to associate for the purpose of engaging in those activities protected by the First Amendment–speech, assembly, petition for the redress of grievances, and the exercise of religion." *Id.* The Constitution does not "recognize[] a generalized right of 'social association.'" *City of Dallas v. Stanglin*, 490 U.S. 19, 25 (1989). Although "[i]t is possible to find some kernel of expression in almost every activity a person undertakes . . . the activity of . . . dance-hall patrons – coming together to engage in recreational dancing – is not protected by the First Amendment . . . [and] qualifies neither as a form of 'intimate association' nor as a form of 'expressive association' as those terms were described in *Roberts*." *Id.*

Here, Plaintiff operates a catering hall, which holds "weddings, sweet-sixteens, birthdays and other private parties." (SAC ¶ 9.) Plaintiff does not allege that any of the events at its catering hall were held for the purpose of engaging in protected speech, assembly, or to petition for the redress of grievances, which would warrant First Amendment protection as "expressive association." Though Plaintiff argues that Defendants' actions infringed on its clientele's rights to express their religion at their marriage celebrations – allegedly implicating protections for both expressive and intimate association – Plaintiff's complaint is devoid of any allegations to support such a claim. Without more, Plaintiff's allegations appear to fit squarely within the types of unprotected association recognized in *Roberts* and *Stanglin* – association for commercial, social, or recreational purposes. *See Roberts*, 468 U.S. at 620; *Stanglin*, 490 U.S. at 25. Accordingly, Plaintiff's First Amendment claim is dismissed.

   B.    *Equal Protection*

Plaintiff's second theory of liability under § 1983 is premised on the Defendants' alleged selective enforcement of the Live Entertainment Statute and its 2 a.m. curfew against Plaintiff but not against similarly situated White Establishments, in violation of the Equal Protection Clause of the Fourteenth Amendment.

The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." *Diesel v. Town of Lewisboro*, 232 F.3d 92, 103 (2d Cir. 2000) (internal citations and quotation marks omitted).  A plaintiff may plead intentional discrimination in violation of the Equal Protection Clause in a number of ways, including based on theories of selective enforcement and a "class-of-one."  *See Witt v. Vill. of Mamaroneck*, No. 12 Cv. 8778 (ER), 2015 WL 1427206, at *4 (S.D.N.Y. Mar. 27, 2015).  To succeed on a theory of selective enforcement, a plaintiff must prove that: "(1) the [plaintiff], compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person."  *LeClair v. Saunders*, 627 F.2d 606, 609-10 (2d Cir. 1980).  Similarly, to succeed on a "class-of-one" theory, a plaintiff must prove: "(1) intentional disparate treatment, (2) from other similarly situated individuals, (3) without a rational basis for the difference in treatment, and (4) without otherwise claiming membership in a particular class or group."  *Witt*, 2015 WL 1427206 at *4 (citing *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)).  Notwithstanding that Plaintiff's allegations in the SAC are specifically styled as "selective enforcement" claims, (*see*, *e.g.*, SAC at 4, 13), Defendants argue that Plaintiff alleges a "class-of-one" theory.  (Def.'s Mot. to Dismiss at 10.)  But Plaintiff's claim is based upon the race of its clientele – a particular group – and should not be analyzed under a "class-of-one" theory.  The Court therefore analyzes Plaintiff's equal protection claim under a theory of selective enforcement.

      1.      "Similarly Situated" Analysis

In order to prevail on its selective enforcement theory, Plaintiff must show that similarly situated establishments were treated differently.  There is, however, "disagreement within the Second Circuit regarding the degree of similarity that a plaintiff must show in order to

13

adequately allege an equal protection claim under the selective enforcement theory." *Witt*, 2015 WL 1427206 at *5 (internal citation omitted).  Some courts in this Circuit have applied the "class-of-one" similarly situated standard to selective enforcement claims, requiring a plaintiff to show that: "(i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendant acted on the basis of a mistake." *Mosdos Chofetz Chaim, Inc. v. Vill. of Wesley Hills*, 815 F. Supp. 2d 679, 693 (S.D.N.Y. 2011). Other courts have applied a "slightly less stringent" standard to selective enforcement claims, requiring a plaintiff to "show that the comparators are 'similarly situated in all material respects.'" *Witt*, 2015 WL 1427206 at *5 (citing *Mosdos Chofetz Chaim*, 815 F. Supp. 2d at 696).  In applying the less stringent standard to a selective enforcement claim, the court in *Mosdos Chofetz Chaim* explained:

> An extremely high level of similarity is required in the "class of one" context because plaintiffs asserting those claims are attempting to prove that the government's treatment was arbitrary and irrational.  However, in the present case, Plaintiffs are not alleging that Defendants sued them . . . to block the . . . project for no reason at all; instead, they have specifically and repeatedly alleged that Defendants have targeted their project because [of their religion]. . . . Accordingly, the Court believes it is appropriate to utilize a less stringent standard than would apply if Plaintiffs were claiming there was simply no rational reason for the disparate treatment.

815 F. Supp. 2d at 696-97.  For the same reasons, the Court follows *Mosdos Chofetz Chaim* and other cases in this Circuit that have applied a less stringent standard to selective enforcement claims.  *See*, *e.g.*, *Walker v. City of New York*, No. 05 Cv. 1283 (RER), 2010 WL 5186779, at *7 (E.D.N.Y. Dec. 15, 2010); *Abel v. Morabito*, No. 04 Cv. 07284 (PGG), 2009 WL 321007, at *4 (S.D.N.Y. Feb. 10, 2009).  Therefore, Plaintiff "must identify comparators whom a 'prudent

person would think . . . [were] roughly equivalent.'"  *Abel*, 2009 WL 321007 at *5 (quoting

*Estate of Morris v. Dapolito*, 297 F. Supp. 2d 680, 686 (S.D.N.Y. 2004)) (alterations in original).

"While a plaintiff is not required to proffer evidence of similarly situated [comparators]

at the motion to dismiss stage, the court still must determine whether, based on a plaintiff's

allegations in the complaint, it is plausible that a jury could ultimately determine that the

comparators are similarly situated."  *Vaher v. Town of Orangetown, N.Y.*, 916 F. Supp. 2d 404,

434 (S.D.N.Y. 2013) (citing *Mosdos Chofetz Chaim*, 815 F. Supp. 2d at 697-98) (internal

quotation marks omitted).  The SAC raises allegations sufficient to satisfy this standard.

Plaintiff's allegations demonstrate that the White Establishments, five bars located in Highland

Falls, are roughly equivalent to the Plaintiff – each establishment has live entertainment at its

facility from time to time; plays music up to and at times past the 2 a.m. curfew; serves alcohol;

and has a history of altercations on its premises.  (*See* SAC ¶¶ 22, 62, 65, 105, 109.)  In all

material respects, Plaintiff and the White Establishments are the same, except for the alleged race

of their respective clienteles.[2]  Defendants' argument that Plaintiff has not shown the extremely

high degree of similarity between itself and the White Establishments is unavailing.  As the

Court discussed above, the "class-of-one" standard for comparators is not applicable in this

matter.

---

[2] The SAC appears to suggest that the Mayor's deejay business would suffice as a comparator.  The Court disagrees, as Plaintiff and a deejay business are not the same in all material respects; for example, a deejay business does not have a physical structure and does not serve alcohol.  Nevertheless, the Court notes that Defendants' reading of the Live Entertainment Statue as not applicable to an entertainer is fraught with problems.  (*Compare* Def.'s Mot. to Dismiss at 12 n.4. *with* Village Code 126-2(B) ("Any *person* providing live entertainment . . . shall be required to obtain a permit . . . .") (emphasis added) *and* Village Code 126-1 (defining "person" as "any person, firm, corporation or association" that owns or controls a jukebox, or "in whose place of business" any jukebox is placed)).

15

2.     Selective Enforcement

Having demonstrated the existence of similarly situated establishments, Plaintiff

mush show:

> (1) the [establishment], compared with others similarly situated, was selectively treated, and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the person.[3]

*Zahra v. Town of Southold*, 48 F.3d 674, 683 (2d Cir. 1995) (internal citations omitted).

Satisfying the first prong of the analysis often requires evidence of "the municipality's

knowledge of the other, unenforced violations" committed by the comparators.  *Christian v.*

*Town of Riga*, 649 F. Supp. 2d 84, 94 (W.D.N.Y. 2009) (citing *LaTrieste Restaurant v. Vill. of*

*Port Chester*, 188 F.3d 65, 69 (2d Cir. 1999)).  Nevertheless, the Second Circuit recognized in

*LaTrieste* that "[i]t is conceivable that selective treatment could be shown where, for example,

proof was offered that a municipality did not know of prior violations because it adhered to a

see-no-evil policy of not enforcing an ordinance, and then abandoned that policy with respect to

a violator engaged in protected activity." *LaTrieste*, 188 F.3d at 70 n.1.

Under the first prong of the analysis, Plaintiff has sufficiently alleged that it was treated

differently than the White Establishments.  First, Plaintiff was subjected to a uniquely

burdensome Live Entertainment Permit application process.  After filing its permit application,

the Chief of Police concluded that Plaintiff was of good moral character and was entitled to

receive a permit.  Nevertheless, the Mayor requested that the Chief of Police not approve the

permit "until I tell you to," (SAC ¶ 41), and the Defendants refused to issue the permit until after

---

[3] Defendants apply the "class-of-one" equal protection test in their memorandum of law in support of the instant motion, which requires that the alleged facts "plausibly support a claim that [Plaintiff] was 'intentionally treated differently from [comparators] without any rational basis.'"  (Def.'s Mot. to Dismiss at 11.)  Rather than wholesale disregard Defendants' arguments for applying the wrong standard, to the extent possible the Court reviews their arguments under the appropriate selective enforcement test.

the Village Board voted on the application.  Under the Live Entertainment Statute, neither the

Mayor nor the Village Board has the power to approve or deny the permit.  Plaintiff alleges that

it was the only applicant to ever: (1) require a vote of the Village Board to approve its permit; (2)

wait more than three days for approval of its permit; and (3) have the Mayor instruct the Chief of

Police to delay approval of its permit, all of which present alleged disparate treatment compared

to the White Establishments.

Second, Plaintiff was the only establishment threatened with a violation of the 2 a.m.

curfew,[4] despite the fact that, at least during May 2014, a number of the White Establishments

played music in violation of the curfew.  Defendants' lack of actual notice is of no consequence

with respect to the violations of the 2 a.m. curfew, as the SAC includes allegations that the Live

Entertainment Statute, and therefore its curfew, has not been enforced for at least the last 40

years.  (*See* SAC ¶ 29 and Ex. D.)  Such allegations fall squarely within the contemplated

exception to the knowledge requirement recognized in *LaTrieste*.  188 F.3d at 70 n.1.

Moreover, Plaintiff was purportedly subjected to an inordinate amount of police presence

at its establishment, as well as a number of baseless police investigations – some of which were

initiated directly by the Mayor – despite the fact that there were only two altercations at its

establishment during the roughly 16 months Plaintiff operated prior to filing this action, one that

was resolved without issue, and the other that occurred shortly after Plaintiff received its Live

Entertainment Permit.  Although the latter incident did not result in any arrests and did not

involve any weapons, the Mayor sent a warning letter to Plaintiff that its permit could be in

---

[4] Defendants appear to contend that Plaintiff lacks standing to bring its equal protection claim based on a violation of the 2 a.m. curfew because "Plaintiff does not allege that it has been issued a notice for violating this provision but only that it has been forced to abide by it out of fear of such notice.  Defendants' warning to Plaintiff does not amount to enforcement."  (Def.'s Mot. to Dismiss at 15.)  Nevertheless, Plaintiff need not violate the law in order to bring its claim.  An "imminent" injury is sufficient to confer standing. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

jeopardy if there were future incidents.  (SAC ¶¶ 100-102.)  The Mayor never sent warning letters to the White Establishments, nor did he order a heavy police presence outside of their locations, even though those establishments had a number of altercations at their locations, some of which resulted in arrests.  (SAC ¶¶ 88-92, 105-108.)

Defendants make much ado about nothing with regard to Plaintiff's allegations concerning the history of police incidents at Nicoles.  Of the eight police reports included with Defendants' instant motion: two were initiated at the behest of the Mayor, both of which were investigated and revealed no wrongdoing; two were investigations of vehicles in Nicoles' parking lot, which appear unrelated to anything occurring within the establishment and ultimately revealed no problems; one involved a noise complaint that was corrected by Nicoles prior to the arrival of the police; one involved a malfunctioning fire alarm; one involved a small group of patrons in Nicoles' parking lot, who were asked to return to the inside of the establishment and did so "without incident" (*see* Def.'s Mot. to Dismiss, Burke Aff., Ex. A. at 3); and one involved an altercation, but resulted in no charges being filed.  Although Plaintiff's counsel is listed under "persons involved" on the reports, even a cursory review of the narratives included in each report makes clear that Plaintiff's counsel was never present at, let alone interviewed in connection with, these events.  Police only spoke with an employee of Plaintiff in connection with two of the reports and never spoke with Plaintiff's counsel.  The first of the two investigations was initiated by the Mayor and revealed no wrongdoing; the second was quickly resolved "without incident" according to the police, in full cooperation with Plaintiff.  Further, with the exception of the one altercation that resulted in no charges being filed, about which Plaintiff and its counsel have stated they were not aware, (Pl.'s Mot. in Opp., Charles Aff. at ¶ 3, Feigelson Aff. at ¶ 2), the rest of the so-called "incidents" were merely police investigations that

resulted in no warnings or charges of any kind.  Rather than read the SAC with an eye towards a common-sense understanding of "police complaints or incidents," (SAC ¶ 21), as the police officers apparently do when using the term in their reports (*see* Def.'s Mot. to Dismiss, Burke Aff., Ex. A. at 3) (resolving a matter "without incident"), Defendants disingenuously twist the SAC in an act of gamesmanship to which this Court does not take kindly.  It is clear from the police reports that there was only one "incident" at Nicoles prior to the issuance of the Live Entertainment Permit violation, and Plaintiff has disclaimed knowledge of it.  The Court finds Defendants' arguments on this issue unavailing.[5]

      To the extent that Plaintiff's equal protection claim is based on the theory that it was the only establishment to receive a notice for violating the Live Entertainment Statute in the last 40 years, despite the fact that the White Establishments also played live music from time to time, such allegations on their own are insufficient to state a claim.  Plaintiff has not alleged that the White Establishments were providing live entertainment without the requisite permit at the same time Plaintiff received its violation notice (or any other time for that matter), and therefore cannot claim that the other establishments were treated differently by the Defendants.[6]  For the

---

[5] "In deciding a motion to dismiss, a court may take judicial notice of public records," including police reports like those submitted by Defendants in connection with the instant motion.  *Fine v. ESPN, Inc.*, 11 F. Supp. 3d 209, 223 (N.D.N.Y. 2014) (citing *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007); *Liang v. City of New York*, No. 10 Cv. 3089, 2013 WL 5366394, at *5 (E.D.N.Y. Sept. 24, 2013) (taking judicial notice of police reports and court filings); *Wims v. N.Y.C. Police Dep't*, No. 10 Cv. 6128, 2011 WL 2946369, at *2 (S.D.N.Y. July 20, 2011) (finding that a district court may take judicial notice of "arrest reports" when deciding a 12(b)(6) motion)).  "However, a court may take judicial notice of such documents 'only to establish their existence and legal effect, or to determine what statements [they] contained ... *not for the truth of the matters asserted.*'" *Id.* (internal citations omitted) (emphasis in original).  Whether or not the Court takes judicial notice of the police reports is of no consequence, as the Court does not find Defendants' arguments with respect to the reports persuasive and they do not factor into the Court's decision.

[6] The Court notes that the live entertainment permits Plaintiff's counsel received through a F.O.I.L. request made to the Village show that the White Establishments had live entertainment permits covering portions of the time period from January 2009 through December 2013, such that they may have been permissibly providing live entertainment in the past.  (*See* Def.'s Mot. to Dismiss, Aff. of Regina Taylor at Ex's A & B.)  Nearly all of the permits were issued for a period of six months, rather than one year.  *Id.*  Therefore, Plaintiff's equal protection claim based upon the difference in duration of the permits is unavailing, as it has not sufficiently alleged that the White Establishments received permits longer in duration than Plaintiff.

same reasons, Plaintiff's equal protection claim cannot be based on the amendment to the Live Entertainment Statute, as the SAC is devoid of allegations that any other establishments were treated differently after the amendment.

Turning to the second prong of the selective enforcement analysis, "a plaintiff advancing a selective enforcement claim must demonstrate that a discriminatory purpose was a motivating factor in the government decision.  Discriminatory purpose implies that the decisionmaker selected or reaffirmed a particular course of action at least in part because of[,] not merely in spite of[,] its adverse effects upon an identifiable group." *Adler v. Kent Village Housing Co.*, 123 F. Supp. 2d 91, 98 (E.D.N.Y. 2000) (internal citations and quotation marks omitted).  Here, accepting Plaintiff's well-pleaded allegations as true, and drawing all reasonable inferences therefrom, the SAC contains statements and conduct that, if proven true at trial, could give rise to an inference of discrimination.  Specifically, Plaintiff alleges that Defendants waged an intentional campaign to harass and ultimately shut down Plaintiff's catering hall due to the race of its clientele.  Plaintiff alleges that its employees and clientele were predominately African-American (SAC ¶¶ 7-9.)  When the Mayor spoke with an employee of Plaintiff's, he stated that the establishment was "getting the 'wrong crowd'" and that he did not want "these types of people infecting Highland Falls."  (SAC ¶ 13.)  Moreover, the Mayor stated during a Village Board meeting that he was concerned about the events happening at Nicoles because "they're attracting a large group from Spring Valley and Newburgh."  (SAC ¶ 11.)  These communities are commonly known to include large populations of African-Americans.  (SAC ¶ 12.)  The Mayor went as far as proposing an amendment to the Live Entertainment Statute for the stated purpose of rescinding Plaintiff's Live Entertainment Permit, fining it, and putting its owners in jail due to its clientele.  (SAC ¶¶ 56-57.)  At this stage of the proceedings, Plaintiff is entitled to

the reasonable inference that the Mayor's statements are "code words" for African-Americans, and that the Defendants' actions were motivated at least in part by the race of Plaintiff's clientele, particularly in light of the disparate treatment that Plaintiff alleges between itself and the White Establishments.

Accordingly, Plaintiff has sufficiently plead a claim of selective enforcement under the Equal Protection Clause based on allegations of a disparate permit application process, selective enforcement of the 2 a.m. curfew, and the inordinate amount of police presence at and investigation of its establishment.  Plaintiff's claims based on selective enforcement of the Live Entertainment Permit requirement, amendment of the Live Entertainment Statute, and the duration of the permit issued to Plaintiff, are dismissed.[7]

### C.      Due Process

The SAC contains a number of allegations that could form the basis of both procedural and substantive due process claims.  Nevertheless, Plaintiff's memorandum of law in opposition to the instant motion identifies only two substantive due process rights at issue: Plaintiff's "ability to use and enjoy its real property" and its "liberty right in being prevented from pursuing its catering and bar business."  (Pl.'s Mot. in Opp. at 19.)

The Due Process Clause of the Fourteenth Amendment requires that no "state . . . deprive any person of life, liberty, or property, without due process of law."  "In order to succeed on a due process claim, whether procedural or substantive, plaintiffs must identify a valid liberty or property interest."  *Vlahadamis v. Kiernan*, 837 F. Supp. 2d 131, 155 (E.D.N.Y. 2011), *amended* No. 08 Cv. 2876 (DRH) (AKT), 2011 WL 5156340 (E.D.N.Y. Oct. 28, 2011) (citing *Toussie v.*

---

[7] The Court does not address Defendants' immunity arguments with respect to the equal protection claims in light of the insufficiency of the allegations concerning the issuance of the permit violation and the amendment of the Live Entertainment Statute.

21

*County of Suffolk,* 806 F. Supp. 2d 558, 578-79 (E.D.N.Y. 2011); *Local 342, Long Island Pub.*

*Serv. Emps. v. Town Bd. of Huntington,* 31 F.3d 1191, 1194 (2d Cir. 1994); *and Harlen Assocs.*

*v. Inc. Vill. of Mineola,* 273 F.3d 494, 503 (2d Cir. 2001)); *see also Zahra*, 48 F.3d at 680 (citing

*Brady v. Town of Colchester*, 863 F.2d 205, 211-12) (requiring a plaintiff to first allege a

property interest).  The ownership and use of real property is an interest protected by substantive

due process.  *See Ferran v. Town of Nassau*, 471 F.3d 363, 369 (2d Cir. 2006) (recognizing the

ownership of a parcel of land constitutes a property interest); *see also Rittenhouse Entm't, Inc. v.*

*City of Wilkes-Barre*, 861 F. Supp. 2d 470, 486 (M.D. Pa. 2012) (citing *DeBlasio v. Zoning Bd.*

*of Adjustment for Twp. of West Amwell,* 53 F.3d 592, 601 (3d Cir. 1995), *abrogated on other*

*grounds by United Artists Theatre Circuit, Inc. v. Twp. of Warrington, Pa.,* 316 F.3d 392 (3d Cir.

2003)).  Similarly, "[t]here is a well-established liberty interest in engag[ing] in any of the

common occupations of life."  *Vlahadamis*, 837 F. Supp. 2d at 156 (citing *Donato v. Plainview-*

*Old Bethpage Cent. Sch. Dist.*, 96 F.3d 623, 632 (2d Cir. 1996)).  Nevertheless, "[i]t is well

settled that one must have no ability to practice one's profession at all in order to state a claim

for deprivation of a liberty interest."  *Rodriguez v. Margotta*, 71 F. Supp. 2d 289, 296-97

(S.D.N.Y. 1999) *aff'd*, 225 F.3d 646 (2d Cir. 2000) (citing *Bernard v. United Township High*

*School Dist. No. 30,* 5 F.3d 1090 (7th Cir. 1993); *LaTessa v. New Jersey Racing Commission,*

113 F.3d 1313, 1318 (3d Cir. 1997); *Cf. Valmonte v. Bane,* 18 F.3d 992 (2d Cir. 1994)).

   Plaintiff relies on *Rittenhouse* to support its contention that Defendants have deprived it

of the use and enjoyment of its real property.  *Rittenhouse* is distinguishable from the instant

matter.  There, the plaintiffs alleged that the defendants' "harassment made it financially

impossible for them to operate . . . more than sporadically."  861 F. Supp. 2d at 486.  Plaintiff

makes no such allegations here.  Instead, Plaintiff alleges that Defendants' actions caused it to:

"incur[] damages in the form of lost profits and . . . ill will with its customers" (SAC ¶ 48);

"suffer financial damages" (SAC ¶ 94); and incur damages to its "income and income

prospects." (SAC ¶ 124.) In fact, it appears that Plaintiff only had to cancel two events as a

result of the alleged harassment. (SAC ¶¶ 47-48.) As Plaintiff was still able to maintain its

business despite Defendants' purported harassment, Plaintiff has not sufficiently plead the

deprivation of any property right. *See Rankel v. Town of Somers*, 999 F. Supp. 2d 527, 546

(S.D.N.Y. 2014).

Similarly, Plaintiff's claim based on a deprivation of its liberty interest also fails.

Plaintiff has not alleged that it has been completely prevented from running its business. Instead,

as noted above, Plaintiff has purportedly suffered financial damages and was forced to cancel

only two events. Without more, Plaintiff cannot sustain a due process action based on its liberty

interest.

Nevertheless, Plaintiff notified the Court on January 12, 2015 that, "as a result of

Defendants' actions, Nicoles has decided to close." (January 12, 2015 Letter of Jeff Feigelson,

Docket No. 22.) In light of this development, the Court grants Plaintiff the opportunity to amend

the SAC to state a valid claim for a violation of the Due Process Clause in accordance with the

requirements outlined in this Opinion.

D.     *Section 1981*

Plaintiff's final theory of liability under § 1983 arises under 42 U.S.C. § 1981, which

states, in pertinent part:

> All persons within the jurisdiction of the United States shall have the same right in every
> State and Territory to make and enforce contracts, to sue, be parties, give evidence, and
> to the full and equal benefit of all laws and proceedings for the security of persons and
> property as is enjoyed by white citizens, and shall be subject to like punishment, pains,
> penalties, taxes, licenses, and exactions of every kind, and to no other.

23

42 U.S.C. § 1981(a).  In order to survive a motion to dismiss on a § 1981 claim, a plaintiff must

allege: "(1) the plaintiff is a member of a racial minority; (2) an intent to discriminate on the

basis of race by the defendant; and (3) the discrimination concerned one or more of the activities

enumerated in the statute . . . ."  *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 7 F.3d 1085,

1087 (2d Cir. 1993) (internal citation omitted).  "The first element has been modified so that a

plaintiff need not be a member of a racial minority so long as the plaintiff has alleged an injury

[derivative] of defendant's discriminatory actions against a racial minority."  *Costello v. Town of

Huntington*, No. 14 Cv. 2061 (JS) (GRB), 2015 WL 1396448, at *12 (E.D.N.Y. Mar. 25, 2015)

(citing *Puglisi*, 947 F.Supp. at 700).  As the Court has already determined that Plaintiff has

standing to pursue its § 1981 claim, and its pleadings adequately allege claims under the Equal

Protection Clause concerning an intent to discriminate on the basis of race by Defendants, the

Court turns to the third prong of the analysis – whether the discrimination falls within the

activities enumerated in the statute.

Plaintiff contends that Defendants violated § 1981 by depriving Plaintiff of "equal

protection under the laws" and "its right to make and enforce contracts."  (SAC ¶ 131.)  With

respect to the "equal protection" violation, the Court construes this claim as one for a deprivation

of Plaintiff's right "to the full and equal benefit of all laws and proceedings for the security of

persons and property as is enjoyed by white citizens."  42 U.S.C. § 1981(a).  To allege such a

claim, Plaintiff must: (1) allege racial animus; (2) "identify a relevant law or proceeding for the

'security of persons and property;'" and (3) allege "that defendants have deprived them of 'the

full and equal benefit' of this law or proceeding."  *Phillip v. Univ. of Rochester*, 316 F.3d 291,

298 (2d Cir. 2003) (citing 42 U.S.C. § 1981(a)).  Although the Second Circuit in *Phillip* did not

"attempt to define the universe of laws and proceedings for the security of persons and property,

believing this task best resolved case by case[,]" the court had "no difficulty categorizing . . . a criminal investigation . . . as a 'proceeding for the security of persons and property' at the Rule 12(b)(6) stage." *Id.*

Plaintiff satisfies the first prong of the *Phillip* test, having already adequately alleged racial animus in this matter in connection with its other claims.  Turning to the second prong of the test, Defendants contend that Plaintiff has not stated a claim under the "equal benefit" clause of § 1981 because Plaintiff has not identified a law or proceeding intended for the security of persons or property.  Defendants assert that cases that have analyzed this clause typically sound in tort and Plaintiff has failed to show how the statutes and restrictions at issue are the type of laws contemplated by § 1981.  *See*, *e.g.*, *Pierre v. J.C. Penney Co.*, 340 F. Supp. 2d 308, 313 (E.D.N.Y. 2004) (finding that state laws against assault, battery, and false imprisonment were laws clearly intended for the security of persons).  Despite Defendants' arguments to the contrary, Plaintiff has identified proceedings for the security of persons and property, to wit, that the Mayor: (1) ordered the police to issue a violation notice to Plaintiff (SAC ¶ 18); and (2) instructed the police to conduct a detailed investigation of Plaintiff.  (SAC ¶ 75.)  Here, like *Phillip*, Plaintiff's "allegations are sufficient because [P]laintiff[']s claim that [D]efendants attempted to trigger a legal proceeding against [P]laintiff[] but would not have taken the same action had white [establishments] engaged in the same conduct."  *Phillip*, 316 F.3d at 298 (2d Cir. 2003).

Plaintiff's second theory under § 1981 – a deprivation of "its right to make and enforce contracts" – is unable to withstand a motion to dismiss.  Plaintiff contends that "Defendants' actions . . . have deterred individuals from patronizing the Plaintiff's establishment and thus entering into contracts for the sale and purchase of goods and services such as catering services,

beverages and entertainment."  (Pl.'s Mot. in Opp. at 22.)  Nevertheless, "where–as here–a plaintiff merely alleges possible loss of future opportunities with unnamed persons, rather than the loss of an identified business relationship that was the subject of interference, the plaintiff cannot maintain an action under § 1981."  *Ginx, Inc. v. Soho Alliance*, 720 F. Supp. 2d 342, 360 (S.D.N.Y. 2010), *as corrected* (Aug. 19, 2010); *see also Robledo v. Bond No. 9*, 965 F. Supp. 2d 470, 477 (S.D.N.Y. 2013) (dismissing § 1981 claim on the ground that plaintiffs "failed to identify specific contracts with identified customers which were allegedly impeded by [the d]efendants' discriminatory conduct."); *Korova Milk Bar of White Plains, Inc. v. PRE Properties, LLC*, No. 11 Cv. 3327 (ER), 2013 WL 417406, at *13 (S.D.N.Y. Feb. 4, 2013) (dismissing § 1981 claim on the ground that plaintiff "merely allege[d] that it lost contractual opportunities with clientele who did and would have frequented [it], without providing specific details regarding this speculative class.").

Accordingly, Plaintiff's § 1981 claim based upon its right to make and enforce contracts is dismissed.  Plaintiff's § 1981 claim based upon the "equal benefit" clause of the statute survives the instant motion.

### E.    *Monell Liability*

"Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*."  *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).  It has long been established that a municipality cannot be held vicariously liable under § 1983 unless the "execution of the government's policy or custom . . . inflicts the injury."  *Monell v. Dep't of Social Servs. of the City of N.Y.*, 436 U.S. 658, 694 (1978).  Thus, *Monell* dictates that any § 1983 claim against a municipal entity must be premised on the theory that the municipal actor's allegedly unconstitutional "acts were performed pursuant to a municipal policy or

custom." *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 226 (2d Cir. 2004); *see generally Monell*, 436 U.S. at 692-94.

Courts in this Circuit apply a two prong test for § 1983 claims brought against a municipal entity.  *Vippolis v. Vill. of Haverstraw*, 768 F.2d 40, 44 (2d Cir. 1985) (internal citation omitted).  First, the plaintiff must "prove the existence of a municipal policy or custom in order to show that the municipality took some action that caused his injuries beyond merely employing the misbehaving officer."  *Id.* (internal citation omitted).  Second, the plaintiff must establish a "'direct causal link between a municipal policy or custom and the alleged constitutional deprivation.'"  *Hayes v. Cnty. of Sullivan*, 853 F. Supp. 2d 400, 439 (S.D.N.Y. 2012) (quoting *City of Canton v. Harris*, 489 U.S. 378, 385 (1989)).

To satisfy the first requirement, a plaintiff must allege the existence of:

(1) a formal policy which is officially endorsed by the municipality; (2) actions taken or decisions made by government officials responsible for establishing municipal policies which caused the alleged violation of the plaintiff's civil rights; (3) a practice so persistent and widespread that it constitutes a custom or usage and implies the constructive knowledge of policy-making officials; or (4) a failure by official policy-makers to properly train or supervise subordinates to such an extent that it amounts to deliberate indifference to the rights of those with whom municipal employees will come into contact.

*Moray v. City of Yonkers*, 924 F. Supp. 8, 12 (S.D.N.Y. 1996) (internal citations and quotation marks omitted); *see also Brandon v. City of New York*, 705 F. Supp. 2d 261, 276-77 (S.D.N.Y. 2010) (quoting *Moray* and updating citations to cases).  A plaintiff is not required to identify an express rule or regulation in order to establish a *Monell* claim, and a court may infer a municipal policy from acts or omissions of the municipality's policy makers, but in the absence of other evidence, a "single incident of errant behavior is an insufficient basis for finding that a municipal policy caused plaintiff's injury."  *Sarus v. Rotundo*, 831 F.2d 397, 402-03 (2d Cir. 1987); *see also DeCarlo v. Fry*, 141 F.3d 56, 61 (2d Cir. 1998) ("[A] single incident alleged in a complaint,

27

especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy.") (quoting *Ricciuti v. N.Y. City Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991) (internal quotation marks omitted); *see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 123, 125 (1988) (plurality opinion) (explaining that only municipal officials with "final policymaking authority" concerning particular activities giving rise to plaintiff's claims "may by their actions subject the government to § 1983 liability" (internal citation omitted)). "In the end, therefore, a plaintiff must demonstrate that, through its deliberate conduct, the municipality was the moving force behind the alleged injury." *Hayes*, 853 F. Supp. 2d at 439 (quoting *Roe v. City of Waterbury*, 542 F.3d 31, 37 (2d Cir. 2008)) (internal quotation marks omitted).

In the context of a motion to dismiss, "a plaintiff must make factual allegations that support a plausible inference that the constitutional violation took place pursuant either to a formal course of action officially promulgated by the municipality's governing authority or the act of a person with policymaking authority for the municipality." *Missel v. Cnty. of Monroe,* 351 F. App'x 543, 545 (2d Cir. 2009). *See also Twombly*, 550 U.S. at 555.

Plaintiff concedes that it is not aware of any formal policy, (*see* Pl.'s Mot. in Opp. at 9), but contends that the SAC contains sufficient facts to allege that "the actions taken or decisions made by government officials responsible for establishing municipal policies caused the alleged violation of the Plaintiff's civil rights." (Pl.'s Mot. in Opp. at 9.) Defendants counter that Plaintiff merely recites conclusory, boilerplate language in the SAC, and fails to set forth any facts that support a plausible claim. Moreover, Defendants argue that Plaintiff fails to show that the alleged policy was established by a final policy maker who had authority to establish policies for such conduct.

28

As an initial matter, "[m]ayors may be treated as policy-makers without proof of their specific powers and responsibilities." *Rookard v. Health & Hospitals Corp.*, 710 F.2d 41, 45 n.4 (2d Cir. 1983) (citing *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 448 (2d Cir. 1980)); *accord Doe v. Vill. of Mamaroneck*, 462 F. Supp. 2d 520, 560 (S.D.N.Y. 2006). Accordingly, there is no question that the Mayor qualifies as a policy maker for purposes of the instant motion.

Turning to Defendants' other argument, although the specific allegations to which Defendants direct the Court concerning the existence of a policy are conclusory, (Def.'s Mot. to Dismiss at 23), Defendants ignore the battery of allegations included elsewhere in the SAC that support a plausible inference that the alleged constitutional violations occurred pursuant to the acts of a person with policymaking authority for the municipality, namely the Mayor.  Plaintiff clearly alleges that nearly the entirety of the harassment occurred at the request of, or directly from the actions of, the Mayor, because he did not want a large population of African-Americans at Plaintiff's catering hall and in the Highland Falls area.  Therefore, at this stage of the proceedings, Plaintiff is entitled to the inference that Defendants' actions were the result of a municipal policy, practice, or custom.

### F.     *Qualified Immunity*

Defendants claim that the Mayor is entitled to qualified immunity.  "In this Circuit, a defendant may [raise qualified immunity in a pre-answer motion to dismiss], but the defense is held to a higher standard than if it were asserted in a motion for summary judgment."  *Sledge v. Bernstein,* No. 11 Cv. 7450 (PKC) (HBP), 2012 WL 4761582, at *4 (S.D.N.Y. Aug. 2, 2012); *see also McKenna v. Wright,* 386 F.3d 432, 436 (2d Cir. 2004) (a defense of qualified immunity in a motion to dismiss can only be sustained if plaintiff cannot state any facts that would prevent the application of qualified immunity).  "Qualified immunity shields federal and state officials

from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct."  *Ashcroft v. al-Kidd*, 131 S.Ct. 2074, 2080 (2011); *see also Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982) ("Government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.").  "If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct."  *Harlow*, 457 U.S. at 818-19.  It is within the Court's discretion to determine the order in which the two prongs are analyzed.  *Pearson v. Callahan,* 555 U.S. 223, 236 (2009).

Having already decided that Plaintiff sufficiently alleges a violation of constitutional rights, the Court turns to the second prong of the test.  It is without question that the rights at issue, including the right not to be discriminated against on the basis of race, were clearly established at the time of the alleged conduct.  Accordingly, the Mayor is not entitled to qualified immunity.

## III.    Section 1982 Claim

Count Two of the SAC alleges that "Defendants violated 42 U.S.C. § 1982 by depriving Plaintiff Nicoles of its right to 'purchase, lease, sell, hold and convey real and personal property.'"  (SAC ¶ 134.)  Section 1982 states that "[a]ll citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property."  42 U.S.C. § 1982.  "Though the statute has been interpreted broadly, a plaintiff, to state a claim, must allege interference with some right involving real or personal property."  *Bishop v. Toys "R" Us-NY LLC*, 414 F. Supp. 2d 385, 394-95 (S.D.N.Y. 2006) *aff'd sub nom. Bishop v. Toys R Us*, 385 F. App'x 38 (2d Cir.

2010).  To state a claim under § 1982, like the related provision of 42 U.S.C. § 1981, Plaintiff

must allege: "(1) the plaintiff is a member of a racial minority; (2) an intent to discriminate on

the basis of race by the defendant; and (3) the discrimination concerned one or more of the

activities enumerated in the statute . . . ."  *Mian*, 7 F.3d at 1087 (internal citation omitted).

Having already decided that Plaintiff satisfied the first two prongs of the test in connection with

its § 1981 claim, the Court turns to the question of whether Plaintiff's alleged discrimination

concerns its ability to purchase, hold, or sell real or personal property.

Plaintiff's first theory of liability under § 1982, as stated in its memorandum of law in

opposition to the instant motion, is apparently based upon Defendants' discriminatory actions

adversely affecting Plaintiff's "use" of its real property.  (Pl.' Mot. in Opp. at 22.)  Plaintiff cites

two cases – *United States v. Brown*, 49 F.3d 1162, 1166 (6th Cir. 1995) and *Olzman v. Lake Hills*

*Swim Club, Inc.,* 495 F.2d 1333 (2d Cir. 1974) – in support of the proposition that the use of real

property is protected under § 1982, including use by a non-owner of the property.  Plaintiff does

not allege its own inability to use its property, and in light of the cases cited by Plaintiff, the

Court construes this theory of liability to relate to Plaintiff's customers' ability to use the

property.

Plaintiff's reliance on these cases is misplaced.  Both *Brown* and *Olzman* concerned the

rights of members or their invited guests in specific organizations, the former a synagogue, the

latter a swim club.  In those cases, the courts held that members and their guests had the right "to

go and come at pleasure," *Brown*, 49 F.3d at 1167; *Olzman*, 495 F.2d at 1339, which constituted

a property interest capable of being held under § 1982.  Here, however, Plaintiff's customers –

past, present, and future – are not members or invited guests of any sort of organization, and

therefore have no recognizable property interest.  Plaintiff's customers, like the customers of a

31

restaurant, have no recognizable property interest sufficient to form the basis of a § 1982 claim. *See Perry v. Burger King Corp.*, 924 F. Supp. 548, 552 (S.D.N.Y. 1996) (holding that the "use of a restaurant's bathroom is not a right to 'inherit, purchase, lease, sell, hold, and convey real and personal property.'")  To the extent that Plaintiff believes the closure of its establishment now provides a valid claim under this theory of liability, Plaintiff is granted permission to amend the SAC.

Second, Plaintiff alleges that Defendants' actions deterred customers from patronizing its establishment, thereby interfering with its right to purchase and sell personal property under § 1982. (Pl.' Mot. in Opp. at 22.)  This claim appears to rest on the same set of facts as Plaintiff's § 1981 claim for deprivation of its right to make and enforce contracts. (*Id.*)  Courts that have considered claims brought under § 1981 and § 1982 have done so in tandem. *See*, *e.g.*, *Rittenhouse*, 861 F. Supp. 2d at 483; *see also Korova*, 2013 WL 417406 at *8 ("Sections 1981 and 1982 are generally construed in pari materia.") (internal citation and quotation marks omitted).  Plaintiff has not directed the Court to any authority, in this Circuit or otherwise, to support such a claim.  As this claim rests on the same set of facts as Plaintiff's § 1981 contract claim, the Court sees no reason to depart from the rule in this District that claims based upon the possible loss of future opportunities with unnamed persons are not actionable. *See* Section II, D, *supra*; *Ginx*, 720 F. Supp. at 360.

## IV.    Disqualification of Counsel

Defendants request that this Court permit them to move to disqualify Mr. Feigelson as Plaintiff's counsel, or to consider their request as a motion to disqualify, on the basis that Mr. Feigelson "is listed as an involved person on all of the police reports and will likely be called to testify about these incidents." (Def.'s Mot. to Dismiss at 4 n.1.)  The Court accedes to Defendants' request to consider this their motion to disqualify, and denies the motion.

Rule 3.7(a) of the New York Rules of Professional Conduct states that, absent certain exceptions, "[a] lawyer shall not act as advocate before a tribunal in a matter in which the lawyer is likely to be a witness on a significant issue."  N.Y. R. Prof'l Conduct § 3.7(a).  "Rule 3.7 lends itself to opportunistic abuse.  Because courts must guard against the tactical use of motions to disqualify counsel, they are subject to fairly strict scrutiny, particularly motions under the witness-advocate rule."  *Murray v. Metro. Life Ins. Co.*, 583 F.3d 173, 178 (2d Cir. 2009) (citing *Lamborn v. Dittmer*, 873 F.2d 522, 531 (2d Cir. 1989)).  To succeed on such a motion, the moving party "bears the burden of demonstrating specifically how and as to what issues in the case the prejudice may occur and that the likelihood of prejudice occurring [to the witness-advocate's client] is substantial."  *Id.* (alteration in original).  "'Prejudice' in this context means testimony that is 'sufficiently adverse to the factual assertions or account of events offered on behalf of the client, such that the bar or the client might have an interest in the lawyer's independence in discrediting that testimony.'"  *Id.*

Defendants' argument in support of disqualification rests solely on Plaintiff's counsel being listed under "persons involved" on the police reports.  Nevertheless, as the Court discussed *supra*, even a cursory review of the narratives included in the police reports makes clear that Plaintiff's counsel was not involved in any of the so-called incidents.  Mr. Feigelson's Affirmation, made under the penalty of perjury, confirms the same.  As Mr. Feigelson has stated that he has no knowledge concerning these incidents, the Court finds it would be highly unlikely he would be called as a witness related to these incidents, and disqualification is therefore improper on this basis.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED in part and DENIED in part.  Defendants' motion to disqualify counsel is DENIED.  Plaintiff shall have until 30 days from the date of this Order to amend the Second Amended Complaint as to the Due Process Clause and 42 U.S.C. § 1982 claims as set forth in this Opinion.  If Plaintiff elects to file a third amended complaint, Defendants shall have until 30 days from the date of Plaintiff's filing to move or file responsive pleadings.  If Plaintiff does not file a third amended complaint, Defendants shall have until 60 days from the date of this Order to file responsive pleadings on the remaining claims.  An initial in-person case management and scheduling conference pursuant to Fed. R. Civ. P. 16 is scheduled for September 11, 2015 at 10:00 a.m., at the United States Courthouse, 300 Quarropas Street, Courtroom 218, White Plains, New York 10601.  The parties shall confer in accordance with Fed. R. Civ. P. 26(f) at least 21 days prior to the conference and attempt in good faith to agree upon a proposed discovery plan that will ensure trial readiness within six months of the conference date.  The parties shall also complete a Civil Case Discovery Plan and Scheduling Order and bring it to the conference.  The Court respectfully directs the Clerk to terminate the motion at ECF No. 12.

Dated:   July 6th, 2015          SO ORDERED:
         White Plains, New York

                                 NELSON S. ROMÁN
                                 United States District Judge